CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 26 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **GARY D. STACY,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:06cv00066 |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,**[1] | ) | Senior United States District |
| | ) | Judge |
| Defendant. | ) | |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

## I. Background and Standard of Review

The plaintiff, Gary D. Stacy, ("Stacy"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Stacy protectively filed his current applications for DIB and SSI on or about November 26, 2003, alleging disability as of November 7, 2003, due to back pain, knee pain, depression and hypertension. (Record, ("R"), at 55-59, 75, 191-94.) The claims were denied initially and upon reconsideration. (R. at 25-31, 34-38.) Stacy then requested a hearing before an administrative law judge, ("ALJ"). (R. at 39.) The ALJ held a hearing on October 14, 2005, at which Stacy was represented by counsel. (R. at 199-226.) On December 2, 2005, the ALJ issued a decision explaining his findings as to Stacy's claims. (R. at 17-24.)

By opinion dated December 2, 2005, the ALJ denied Stacy's claims. (R. at 17-24.) The ALJ found that Stacy met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 23.) The ALJ found that Stacy had not engaged in substantial gainful activity since November 7, 2003, the alleged onset date of disability. (R. at 23.) In addition, the ALJ found that

-2-

Stacy suffered from a severe impairment or combination of impairments, namely degenerative disease of the spine. (R. at 19, 23.) However, the ALJ determined that this medically determinable impairment did not meet or medically equal any of the listed impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) Furthermore, the ALJ found that Stacy's allegations regarding his limitations were not totally credible. (R. at 23.) The ALJ also noted that he had carefully considered all of the medical opinions within the record regarding the severity of Stacy's impairments. (R. at 23.) Based upon a review of the medical evidence, the ALJ found that Stacy possessed the residual functional capacity to perform light[2] work, with a sit/stand option every 30 minutes to accommodate his back pain and no ability to engage in complex or detailed tasks. (R. at 21-24.) Therefore, the ALJ determined that Stacy was not capable of performing his past relevant work as a mine mechanic and driller. (R. at 24.) Based upon Stacy's age, education and past work experience, as well as the testimony of a vocational expert, the ALJ found that there was a significant number of jobs within the national and regional economies that Stacy was capable of performing, including a parking lot attendant, a cashier, a job in protective services, an inspector and a sorter. (R. at 24.) Thus, the ALJ concluded that Stacy was not under a disability as defined under the Act and was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

After the ALJ issued his decision, Stacy pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 13.) The Appeals

---

[2] Light work involves lifting items weighing up to 20 pounds at a time, with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he can also do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

Council found no reason under the rules to review the ALJ's decision and denied Stacy's request for review; thereby, making the ALJ's decision the final decision of the Commissioner. (R. at 7-9.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). Thereafter, Stacy filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Stacy's motion for summary judgment, (Docket Item No. 11), filed October 3, 2006, and on the Commissioner's motion for summary judgment, (Docket Item No. 13), filed October 18, 2006.

## *II. Facts*

Stacy was born in 1963, which classifies him as a "younger individual" under 20 C.F.R. §§ 404.1563(c), 416.963(c). (R. at 55-56, 191-92.) According to the record, Stacy completed the twelfth grade, which classifies him as having a "a high school education and above" under 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). (R. at 203.) Stacy has past relevant work experience as a driller and as a mine mechanic. (R. at 76, 81-88, 206.)

At the hearing before the ALJ on October 14, 2005, Stacy explained that he had not worked since November 2003.[3] (R. at 206.) Stacy testified that he had previously been employed as a mechanic in the coal mines and as a driller for the National Guard. (R. at 206.) When specifically asked about his employment in the coal mines, Stacy indicated that his duties included exchanging parts on the equipment and equipment maintenance. (R. at 206.) He also noted that he worked both underground and on the surface. (R. at 206.) Stacy also was asked about his employment as a

---

[3] The hearing before the ALJ was conducted via video conference. (R. at 201.)

-4-

driller. (R. at 206.) Stacy stated that he worked on a natural gas rig and was required to lift 100 pounds or more. (R. at 207.)

Stacy testified that he ceased work in 2003 because he could no longer perform his job. (R. at 207.) He explained that nothing specific happened to cause him to be unable to work; however, he stated that he had experienced back problems since 1998. (R. at 207.) He testified that a "disc [in his back was] messed up . . . and [his] legs failed [him], and [that he] just couldn't get around to do [his] job." (R. at 207.) Stacy noted that he was unable to lift anything and that he experienced frequent back spasms. (R. at 207.) Despite these alleged problems, Stacy testified that he had not been hospitalized or presented to an emergency room since his alleged onset of disability date. (R. at 207.) Stacy stated that he had sought treatment from a doctor until May 2004, but he claimed he was unable to continue for financial reasons. (R. at 208.) The ALJ asked Stacy if he had veteran's benefits based upon his military service. (R. at 208.) Stacy testified that he did not have veteran's benefits and that he had never attempted to obtain them. (R. at 208.) Stacy acknowledged that he had not seen any doctors since May 2004 and that, at the time of the hearing, he was not taking any medication. (R. at 208.)

The ALJ asked Stacy to discuss the health problems that allegedly interfered with his ability to work. (R. at 208.) Stacy explained that back and leg pain prohibited him from moving around. (R. at 208.) He stated that he was unable to crouch, bend or stoop, and that his hips were "broke down." (R. at 208.) He also testified that he could stand for only approximately 20 minutes due to leg numbness, back spasms and leg spasms. (R. at 208.) Furthermore, Stacy testified that he could

-5-

walk 100 yards without significant pain. (R. at 208.) Stacy also stated that he could sit for only about 15 to 20 minutes. (R. at 209.) The ALJ commented that Stacy had to travel in a car for an hour and a half to the hearing. (R. at 209.) Stacy then explained that he had to stop three times during the trip. (R. at 209.) Thereafter, Stacy agreed that he could sit for 30 minutes at a time. (R. at 209.) Stacy also claimed that he could not carry a 24-pack of soft drinks from his car into his house because of his inability to bend over. (R. at 209.) He stated that he could carry a gallon of milk because it had a handle. (R. at 209.) The ALJ asked Stacy if he would be able to pick up a 100 dollar bill if it fell to the floor, to which Stacy responded, "[w]ell, yeah . . . . If I need a $100.00 as bad as I need $100.00[,] now I probably would. Yes, Judge." (R. at 209.)

Stacy testified that he could not squat or crouch, and that he was unable to push or pull a grocery cart. (R. at 209-10.) Morever, he explained that he could not reach items in the upper cabinets in his kitchen and that he could not climb a flight of stairs. (R. at 210.) However, the ALJ noted that Stacy had to climb steps to get into the courthouse and that there was a flight of stairs in Stacy's home. (R. at 210.) Stacy then admitted that he could climb a flight of stairs if needed. (R. at 210.) He acknowledged that he was able to open doors and jars, and that he was able to dress himself. (R. at 210.) Stacy further testified that he had a valid driver's license with no restrictions. (R. at 210-11.) Stacy explained that he was capable of getting a job where he had a sit/stand option and was not required to lift any weight. (R. at 211.) Furthermore, he testified that, "I ain't saying I can't work . . . .[I]t just got to where I couldn't do my job." (R. at 211.)

Stacy commented that he usually read his mail every day and that he occasionally read certain magazines. (R. at 211.) He indicated that he understood what he read "at times." (R. at 211.) He also stated that he could cook and wash dishes if needed; however, he reported that he was unable to do laundry, sweep, mop, vacuum and make his bed. (R. at 212.) Stacy testified that his mother performed most of the household chores. (R. at 212.) Stacy further testified that he walked about 50 yards per day. (R. at 212.) He explained that he was able to drive a car about once every two weeks. (R. at 212.) Stacy indicated that he did not attend any social functions on a regular basis. (R. at 212.) The ALJ asked Stacy how many hours of television he watched per day, and Stacy stated that he watched television for approximately two or three hours per day. (R. at 213.) He testified that he did not leave his house often and that he did not have any hobbies. (R. at 213.) Stacy also testified that he smoked about a pack of cigarettes per day. (R. at 213-14.) The ALJ asked Stacy whether or not he could take a shower or bath by himself, to which Stacy responded, "I take a shower. I can't take a bath because I can't get up and down in the bathtub." (R. at 214.)

Stacy explained that he had trouble sleeping because his legs flop and twist. (R. at 214.) He testified that on a typical day he slept until around 9:30 to 10 a.m. (R. at 214.) Stacy stated that after getting up, he usually had breakfast, sat around until his back began to hurt and then he would go back to bed. (R. at 214.) He further explained that he would sleep for two or three more hours, have dinner, watch the news and then go back to bed. (R. at 214.) The ALJ asked whether a doctor had instructed Stacy to exercise, to which Stacy responded affirmatively. (R. at 214-15.) However, Stacy stated that "when you can't walk it's hard. I mean, the further I walk

-7-

the worse it gets." (R. at 215.)

Stacy's counsel asked him to describe his back pain. (R. at 215.) He described the pain as "one big back spasm" and noted that the pain in his right leg was not as bad as the pain in his left leg. (R. at 215.) He explained that, in order to relieve the pain, he had to walk around; however, he stated that it was difficult for him to walk because of the numbness in his leg. (R. at 215.) Stacy testified that he experienced leg pain three to four times per day. (R. at 215.)

At this point in the hearing, the ALJ asked Stacy's counsel if he had any medical evidence to support the existence of a condition. (R. at 215.) The ALJ explained that he could not make a finding that Stacy was entitled to benefits based upon mere allegations of symptoms. (R. at 215.) The ALJ recognized that medical evidence had been provided that spanned from 1992 to 1997; however, he noted that the evidence was not relevant since Stacy had worked after that time period. (R. at 215-16.) Stacy's counsel stated that there was evidence of nerve root compression from 2002. (R. at 216.) The ALJ then remarked that Stacy had worked until 2003. (R. at 216.) Stacy's counsel explained that Stacy had no insurance; thus, he was unable to obtain proper treatment. (R. at 216.) Shortly thereafter, Stacy stated "I ain't afraid to work, Judge. I had to quit. I couldn't do my job." (R. at 216.)

Stacy testified that he took ibuprofen to treat his pain. (R. at 216.) He explained that he usually took approximately 12 to 14 pills per day. (R. at 216.) Stacy testified that he had never had insurance because his past employer's did not carry insurance on their workers. (R. at 216.) The ALJ explained that there had to

-8-

be objective medical evidence to support Stacy's allegations, and asked Stacy's counsel if he had sent Stacy to be evaluated by any doctors. (R. at 217.) Stacy's counsel indicated that Stacy had not been sent for further examinations. (R. at 217.)

Stacy was then asked to describe the problems he had experienced with his legs. (R. at 217.) He explained that his legs were weak and that he suffered from throbbing pain and muscle spasms. (R. at 217.) In addition, Stacy testified that he also experienced dizziness and shakes, which he said nearly caused him to pass out. (R. at 218.) However, he noted that he had not nearly passed out since March 2005. (R. at 218.) Stacy attributed the dizziness and the shakes to his nerves. (R. at 218.) He testified that the shakes that he described were caused by any kind of stress. (R. at 218.) Stacy also noted that his hands were constantly sore and stiff. (R. at 218.) At this point in the hearing, the ALJ again asked Stacy's counsel if he had any medical evidence to support any of Stacy's alleged conditions. (R. at 218.) Stacy's counsel indicated that the only evidence was what existed within the record. (R. at 218.) The ALJ stated that he could not make a favorable decision without relevant medical evidence. (R. at 218-19.)

Stacy testified that, at the time of the hearing, he was not under the treatment of a psychologist or a psychiatrist. (R. at 219.) However, Stacy explained that he had been treated in 1999. (R. at 219.) Stacy testified that he had never been hospitalized in a psychiatric facility and that he had never been prescribed antidepressant medications. (R. at 219.) The ALJ then reiterated his earlier statement and commented that he was not permitted by law to make a decision simply based upon descriptions of symptoms, no matter how credible the claimant. (R. at 219.)

-9-

AnnMarie E. Cash, a vocational expert, also testified at the October 14, 2005, hearing. (R. at 220-25.) Cash explained that Stacy's past employment as a mine mechanic was classified as heavy,[4] skilled work. (R. at 221.) Cash also testified that Stacy's employment as a driller was classified as heavy, unskilled work. (R. at 221.) She indicated that Stacy's mechanic skills were not transferable. (R. at 221.) The ALJ then posed a hypothetical to Cash and asked her to assume an individual of Stacy's age, educational background and experience. (R. at 222.) In addition, the ALJ asked Cash to assume that the individual was capable of sitting for 30 minutes, standing for 30 minutes, walking for 15 minutes, with a sit/stand option at a work station, and lifting and/or carrying items weighing up to 10 pounds occasionally. (R. at 222.) The ALJ explained that he was essentially asking Cash to assume the individual was capable of performing a limited range of sedentary work; thus, based upon that assumption, the ALJ asked if there were jobs existing within this region that such a person could perform. (R. at 222.) Cash opined that there were jobs existing within the regional and national economy that a person possessing the above-mentioned limitations could perform. (R. at 222.) She noted that there were certain unskilled jobs that would permit a sit/stand option, such as an inspector or a tester. (R. at 223.) Cash testified that there were significant jobs existing in the regional and national economy in the light category that a person with these limitations could perform, such as a cashier, a parking lot attendant, a parking lot cashier and a ticket taker. (R. at 223-24.)

---

[4] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he can also perform medium, light and sedentary work. *See* C.F.R. §§ 404.1567(d), 416.967(d) (2006).

-10-

The ALJ also asked Cash to assume that Stacy's testimony was credible, and supported by objective medical evidence. (R. at 224-25.) Based upon this assumption, the ALJ asked if there were any jobs that Stacy could perform. (R. at 225.) Cash stated that, based upon the testimony, Stacy would be unable to complete an eight-hour workday because he routinely slept for several hours during the course of the day. (R. at 225.) Thus, Cash determined that Stacy would need breaks beyond what would be typical for a normal workday. (R. at 225.)

At the conclusion of the hearing, the ALJ asked Stacy's counsel if he wished to submit anything else and his counsel indicated that he had nothing to add. (R. at 225.) The ALJ then explained that he planned to review the record to determine whether he should order a consultative examination. (R. at 225.) However, the ALJ noted that he had to have a basis for ordering the examination, and that he could not order one "simply to make the attorney's case when they haven't developed the case." (R. at 225.) In closing, the ALJ stated that if he found a basis, he would order a consultative examination, but, if not, then he would make a decision based upon the record. (R. at 225.)

In rendering his decision, the ALJ reviewed records from Dr. Jackie Briggs, M.D.; Buchanan County Rural Practice; Dr. J. P. Sutherland Jr., D.O.; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; and Eugene Hamilton, Ph.D., a state agency psychologist.

Stacy was treated by Dr. J. P. Sutherland, M.D., sporadically from 1992 to

-11-

1997. (R. at 187-88.) Stacy presented with complaints of a pulled muscle in the left leg and groin area. (R. at 187.) Stacy was diagnosed with an inguinal sprain/strain and prescribed Naprosyn. (R. at 187.) On December 1, 1993, Stacy was once again treated by Dr. Sutherland. (R. at 187.) Stacy complained that he was not feeling well; however, Dr. Sutherland reported that he was alert and oriented, with a regular heart rate and rhythm and clear lungs. (R. at 187.) Dr. Sutherland diagnosed Stacy with hypoglycemia, placed him on a hypoglycemic diet and gave him samples of Orabex. (R. at 187.) On February 14, 1994, Stacy presented to Dr. Sutherland with complaints of a sore throat, an earache and a knot on his right hand. (R. at 188.) Dr. Sutherland found that Stacy had a mild fibroma on the dorsum of the right hand without any evidence of neurological deficits. (R. at 188.) In addition, Dr. Sutherland noted bright erythema of the posterior pharynx with right otitis media. (R. at 188.)

Stacy sought treatment from Dr. Sutherland again on October 21, 1997, complaining of back pain and left knee pain. (R. at 188.) Dr. Sutherland noted that Stacy had decreased range of motion in the lumbar spine with paravertebral muscle spasms. (R. at 188.) Furthermore, Dr. Sutherland reported a positive left leg lift at 30 degrees, and severe muscle spasms in the L3, L4 and L5 levels of the spine. (R. at 188.) Dr. Sutherland also noted a decreased range of motion in the left knee in flexion and expansion that caused a loud popping and grinding sound with no dislocations. (R. at 188.) Stacy was diagnosed with dysfunctional low back syndrome, degenerative joint disease lumbar spine, left sciatica and a torn medial meniscus of the left knee. (R. at 188.) Stacy was prescribed Norflex, Prednisone, Soma, Darvon, Cataflam and an elastic left knee band. (R. at 188.) An x-ray of the

-12-

left knee revealed a patellar spur, with no acute dislocations and no fractures. (R. at 188.) An x-ray also was taken of the lumbar spine and showed spondylolisthesis of the L4 and L5, with narrowing between the L4 and L5 disc space and osteophytes in L4, L5 and S1. (R. at 188.) No pathological fractures were noted. (R. at 188.) Stacy was referred to another physician for an evaluation of his left knee and low back pain. (R. at 188.)

Stacy sought treatment from Dr. Jackie Briggs, M.D., from January 23, 2002 to May 17, 2004.[5] (R. at 155-86.) On January 23, 2002, Stacy presented with complaints of back pain and joint pain. (R. at 184.) No significant abnormalities of the spine or gait were noted. (R. at 184.) In addition, no gross focal sensory or motor deficits were reported. (R. at 184.) Stacy was assessed with nerve root compression and prescribed Lortab, Darvocet and Soma. (R. at 184.) Stacy again sought treatment for back pain on February 6, 2002. (R. at 183.) The medical records indicate that Stacy was feeling better during this visit. (R. at 183.) Stacy once again was assessed with nerve root compression and prescribed Lortab, Darvocet and Soma. (R. at 183.) From March 8, 2002, until July 8, 2002, Stacy saw Dr. Briggs five separate times and no changes were noted in Stacy's condition or in his prescribed medications. (R. at 178-82.) On August 10, 2002, Stacy presented with the same complaints, as well as complaints regarding a possible hernia in the groin area. (R. at 177.) Dr. Briggs noted that Stacy's blood pressure was elevated and again noted nerve root compression. (R. at 177.) Stacy was prescribed Soma, Lortab and Darvocet. (R. at

---

[5] Dr. Briggs referred to a magnetic resonance imaging, ("MRI"), on numerous occasions in Stacy's medical records. (R. at 162, 165, 166, 170, 181, 184.) However, the results of the MRI are not contained within the record.

-13-

177.)  On September 14, 2002, and October 14, 2002, Stacy again sought treatment from Dr. Briggs; however, no changes were noted as to Stacy's condition.  (R. at 175-76.)  In addition to the medications previously prescribed, Stacy was prescribed Captopril.  (R. at 175.)

On November 20, 2002, Stacy saw Dr. Briggs and complained of back pain and leg pain.  (R. at 174.)  In addition, Stacy was in need of his medications.  (R. at 174.)  The medical records indicate that Stacy's blood pressure was elevated and that his medications were not controlling it.  (R. at 174.)  Furthermore, Stacy's spine was tender and a decrease was noted in his range of motion.  (R. at 174.)  Stacy was prescribed Soma, Lortab, Darvocet and Captopril.  (R. at 174.)

Stacy continued to receive treatment from Dr. Briggs on a monthly basis from December 2002 until May 17, 2004.  (R. at 156-73.)  During these visits, Stacy complained of back pain, hip pain and left knee pain. (R. at 156-73.) Based upon the record, it appears that the main purpose of these monthly visits was prescription renewal. (R. at 156-73.) Dr. Briggs noted that Stacy had a decreased range of motion during several visits.  (R. at 167, 170, 172-73.)  However, Dr. Briggs noted a full range of motion during Stacy's 11 most recent visits.  (R. at 156-66.)  Dr. Briggs also reported that Stacy had no significant abnormalities to the spine or gait, and no gross focal sensory or motor deficits.  (R. at 156-66.)  The medical records indicated that Stacy continued to suffer from hypertension, and he was continually prescribed medication to control it.  (R. at 156-66.)  Dr. Briggs repeatedly advised Stacy to continue all physical modalities. (R. at 156-84.) He also repeatedly noted nerve root compression and a herniated nucleus pulpous, ("HNP"), of the lumbar spine at the L4,

-14-

L5 and S1 levels. (R. at 156-84.) Dr. Briggs recommended that Stacy exercise as much as he could tolerate. (R. at 156-62.) In addition, Dr. Briggs noted that Stacy exhibited good body mechanics. (R. at 156-60.)

On February 24, 2004, Dr. Robert McGuffin, M.D., a state agency physician, performed a Residual Physical Functional Capacity Assessment, ("PRFC"). (R. at 130-39.) Dr. McGuffin determined that Stacy was capable of occasionally lifting and/or carrying items weighing up to 20 pounds and frequently lifting and/or carrying items weighing up to 10 pounds. (R. at 131.) Dr. McGuffin also found that Stacy was capable of standing, walking or sittimg for a total of about six hours in an eight-hour workday, with no limitations on his ability to push and/or pull. (R. at 131.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 133-35.) In addition, Dr. McGuffin noted that, as of January 2004, Stacy exhibited a good range of motion and that his pain medications appeared to be effective. (R. at 132.) He also found no evidence of spine or gait abnormalities, no sensory or motor deficits and no abnormalities related to hypertension. (R. at 132.) Thus, Dr. McGuffin determined that Stacy's allegations were only partially credible. (R. at 132.) Dr. McGuffin's findings were reviewed and affirmed by Dr. Michael J. Hartman, M.D., on May 24, 2004. (R. at 137.)

On February 25, 2004, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"). (R. at 140-54.) Tenison found that Stacy had no medically determinable impairment. (R. at 140.) Furthermore, Tenison opined that Stacy's mental allegations were not credible. (R. at 152.) Tenison noted that Stacy's medical records failed to reflect a history of

-15-

treatment, counseling or medication for any mental problems. (R. at 152, 154.) Tenison's findings were reviewed and affirmed by Eugene Hamilton, Ph.D., another state agency psychologist, on May 24, 2004. (R. at 140.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*,

-16-

658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By opinion dated December 2, 2005, the ALJ denied Stacy's claims. (R. at 17-24.) The ALJ found that Stacy met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 23.) The ALJ found that Stacy had not engaged in substantial gainful activity since November 7, 2003, the alleged onset date of disability. (R. at 23.) In addition, the ALJ found that Stacy suffered from a severe impairment or combination of impairments, namely degenerative disease of the spine. (R. at 19, 23.) However, the ALJ determined that this medically determinable impairment did not meet or medically equal any of the listed impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) Furthermore, the ALJ found that Stacy's allegations regarding his limitations were not totally credible. (R. at 23.) The ALJ also noted that he had carefully considered all of the medical opinions within the record regarding the severity of Stacy's impairments. (R. at 23.) Based upon a review of the medical evidence, the ALJ found that Stacy possessed the residual functional capacity to perform light work, with a sit/stand option every 30 minutes to accommodate his back pain and no ability to engage in complex or detailed tasks. (R. at 23-24.) Therefore, the ALJ determined that Stacy was not capable of performing his past relevant work as a mine mechanic and driller. (R. at 24.) Based upon Stacy's age, education and past work experience, as well as the testimony of a vocational expert, the ALJ found that there was a significant number of jobs within the national and regional economies that Stacy was capable of performing, including a parking lot attendant, a cashier, an inspector and a sorter. (R. at 24.) Thus, the ALJ concluded that Stacy was not under a disability as defined under the Act and was not entitled to benefits. (R. at 24.) *See* 20 C.F.R.

-17-

§§ 404.1520(g), 416.920(g) (2006).

Stacy argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 4.) Specifically, Stacy first argues that the ALJ erred in his evaluation of the plaintiff's pain. (Plaintiff's Brief at 4-9.) Second, Stacy argues that the Commissioner has failed to meet his burden of establishing that there is work existing in significant numbers within the national economy that Stacy is capable of performing. (R. at 10-12.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. V. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he or she has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*,

-18-

596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Stacy's first argument is that the ALJ erred in his evaluation of Stacy's pain. (Plaintiff's Brief at 4-9.) Stacy contends that the record shows that he suffers from medically determinable impairments, which could reasonably be expected to cause his pain. (Plaintiff's Brief at 5.) Stacy acknowledged the fact that he was last treated by Dr. Briggs on May 17, 2004, approximately seven months prior to Stacy's alleged onset of disability. (Plaintiff's Brief at 5-6.) However, Stacy argues that, despite the fact that he has not been treated since May 2004, his symptoms of pain, in addition to Dr. Briggs's findings of HNP, nerve root compression and a decreased range of motion of the lumbosacral spine, are conditions that will inevitably worsen over time. (Plaintiff's Brief at 5-6.) Stacy also relies upon the medical records of Dr. Sutherland. (Plaintiff's Brief at 6.) However, this court finds Dr. Sutherland's medical records to be particularly irrelevant, as Stacy's most recent treatment from Dr. Sutherland was more than nine years ago, and more than seven years prior to Stacy's alleged onset of disability. (R. at 187-88.) During that seven year span, Stacy was employed as a coal mine mechanic, where he performed heavy, skilled work. (R. at 114, 221.)

A claimant's statement as to his pain or other symptoms does not, in and of

itself, provide conclusive evidence of disability. 42 U.S.C. § 423(d)(5)(A). As noted in the Plaintiff's brief, "[p]ain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996.) Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *Craig*, 76 F.3d at 594-95. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated that although a claimant's allegations of pain may not be discredited solely because they are not substantiated by objective evidence of pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges. 76 F.3d at 595.

Furthermore, an ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). "Subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 773 F.2d 324, 327 (4th Cir. 1984). Protection of a claimant's power to establish the existence of disabling pain even without objective evidence of

the pain's severity ensures the claimant only the opportunity to persuade the ALJ; it does not, obviously, ensure a favorable result for the claimant. As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90 (affirming ALJ's decision to discredit claimant's testimony as to pain that was out of proportion with objective evidence because the court was persuaded that the ALJ considered the testimony). To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony.

The ALJ clearly considered Stacy's allegations of pain. The medical records that were submitted were reviewed and Stacy was given a hearing before the ALJ where he offered testimony as to his symptoms and allegations of disabling pain. The ALJ determined, by objective medical evidence, that Stacy suffered from degenerative disease of the spine. (R. at 19, 23.) However, the ALJ also noted that during Stacy's most recent visit to Dr. Briggs, in May 2004, he was found to have a full range of motion, no abnormalities to the spine or gait, no gross focal sensory or motor deficits and good body mechanics. (R. at 156.) The ALJ also considered the fact that Stacy complained of back, leg and hip pain, and that medical records referenced an MRI that revealed a nerve root compromise. (R. at 19.) However, despite these complaints, Dr. Briggs's medical records essentially reported that the physical examinations of Stacy were within normal limits. (R. at 156-84.)

The ALJ also took into consideration a PRFC performed by Dr. McGuffin, and affirmed by Dr. Hartman. (R. at 130-37.) Dr. McGuffin determined that Stacy was

-21-

capable of lifting items weighing up to 20 pounds occasionally and items weighing up to 10 pounds frequently. (R. at 131.) He also found that Stacy could stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday and that he was unlimited in his ability to push and/or pull. (R. at 131.) Dr. McGuffin noted that Stacy possessed the residual functional capacity for light work. (R. at 132.) Thus, based upon these findings, which were within the record, the ALJ also considered how Stacy's pain affected his ability to do work.

Morever, Stacy also performed heavy, skilled work as a coal mine mechanic for approximately seven months after his last visit to Dr. Briggs. (R. at 114.) Although Stacy remained under the care of Dr. Briggs from January 2002 until May 2004, it must be noted that his visits were merely routine visits that seemingly were for the purpose of prescription renewal. (R. at 156-84.) There is no evidence within the record that demonstrates any restrictions as to Stacy after his alleged onset of disability. There were no emergency room visits, no hospitalizations and no surgeries were performed. Likewise, the record is devoid of any medical treatment after May 17, 2004. Stacy argues that his inability to pay for medical treatment qualifies as a justifiable reason for not presenting evidence of further treatment. (Plaintiff's Brief at 9.) *See Mickels v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994). However, the ALJ stated that there were no documented efforts to seek help or medications from a free clinic. (R. at 20.) Furthermore, although Stacy claims that he has never had insurance, the records shows that, when he was working, he was able to consistently seek treatment from Dr. Briggs.

Therefore, I find that the ALJ's evaluation as to Stacy's allegations and

-22-

evidence of pain was supported by substantial evidence within the record, and I also find that the ALJ did not base his decision upon Stacy's alleged inability to afford medical treatment.

Stacy argues that the ALJ refused to allow him to describe his pain and symptoms. (Plaintiff's Brief at 6.) This argument is without merit. The transcript of the hearing plainly shows that the ALJ specifically asked Stacy to describe his pain. (R. at 207-15.) Morever, Stacy's counsel also asked questions at the hearing and requested that Stacy describe his various symptoms and pain. (R. at 217.) Additionally, before closing the hearing, the ALJ provided Stacy's counsel with another opportunity to present further evidence; however, Stacy's counsel explained, "[t]hat's all I have." (R. at 219.)

Stacy also argues that, due to his financial difficulties, as well as the lack of current medical information regarding the severity of his claims, the ALJ should have ordered a consultative examination to develop the record. (Plaintiff's Brief at 9.) This court recognizes that the ALJ does indeed have a duty to help develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court stated that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence submitted by the claimant when that evidence is inadequate." 783 F.2d at 1173. The regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. § 416.913(e) (2006). As mentioned above, a PRFC that was performed indicated that

-23-

Stacy was capable of performing light work. (R. at 130-37.) In addition, the medical records from Dr. Briggs noted no significant restrictions as to Stacy's ability to work. (R. at 156-84.)

Furthermore, at the hearing before the ALJ, Stacy testified, "I ain't saying I can't work . . . . [I]t just got to where I couldn't do my job." (R. at 211.) He also stated, "I ain't afraid to work, Judge. I had to quit. I couldn't do my job." (R. at 216.) Stacy plainly stated that he did not mean he could not work; instead, he admitted that he could no longer perform his job as a coal mine mechanic, which qualified as heavy, skilled work. The fact that Stacy can no longer perform heavy, skilled work does not support the argument that he is totally disabled. Based upon Stacy's allegations, as well as the medical evidence, the ALJ determined that Stacy was limited in his ability to work and that he could only perform certain jobs within the light and sedentary exertional level. (R. at 24.) The ALJ's finding was supported by the testimony of a vocational expert who identified jobs existing within the regional and national economy that Stacy could perform. (R. at 220-25.)

I find that the ALJ's findings were supported by substantial evidence within the record; thus, the ALJ was justified in not further developing the record by ordering a consultative examination.

Next, Stacy argues that the Commissioner failed to demonstrate that there are jobs available within the national economy that Stacy can perform. (Plaintiff's Brief 10-12.) Stacy asserts that the ALJ "grossly led" the vocational expert's testimony in order to obtain his desired results. (Plaintiff's Brief at 10.) This particular argument

-24-

has no merit. Although the ALJ did ask several leading-type questions and identify certain jobs that were in accordance with Stacy's limitations, the vocational expert clearly explained that, based upon those limitations, there were jobs that a person with Stacy's limitations could perform. Not only did the vocational expert agree that Stacy could perform certain jobs mentioned by the ALJ, she also identified several other jobs and specifically recited the number of those occupations that were available within the regional and national economies. (R. at 222-24.) Therefore, I am of the opinion that, based upon the vocational expert's testimony, the ALJ properly identified jobs existing within the national economy that Stacy was capable of performing.

Lastly, Stacy contends that the ALJ's hypothetical failed to provide an accurate reflection of Stacy's residual functional capacity or the ALJ's findings. (Plaintiff's Brief at 10-11.) Testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his or her opinion is based upon a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker*, 889 F.2d at 50. The determination of whether a hypothetical question fairly sets out all of a claimant's impairments turns on two issues: 1) whether the ALJ's finding as to the claimant's residual functional capacity is supported by substantial evidence; and 2) whether the hypothetical adequately set forth the residual functional capacity as found by the ALJ.

In the ALJ's opinion, he plainly found that Stacy possessed limitations that required "a sit-stand option every thirty minutes to accommodate back pain and work that [did] not require him to carry out detailed or complex tasks." (R. at 21-22.)

Case 1:06-cv-00066-GMW-PMS   Document 15   Filed 03/26/07   Page 25 of 27   Pageid#: 86

However, in the hypothetical that was posed to the vocational expert, the ALJ did not mention his finding that Stacy was unable to perform jobs that required him to carry out detailed or complex tasks. (R. at 22.) This hypothetical failed to fairly set out all of Stacy's impairments and limitations. *See Walker*, 889 F.2d at 50. The Commissioner may not rely on an answer to a hypothetical question if the hypothesis fails to fit the facts. *See Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979).

Thus, because I find that the ALJ did not pose a hypothetical to the vocational expert that accurately set forth the ALJ's finding as to Stacy's residual functional capacity, the vocational expert's testimony cannot constitute substantial evidence upon which the ALJ may rely in determining Stacy's residual functional capacity and ability to work.[6]

## IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Stacy's residual functional capacity and ability to work.

An appropriate order will be entered.

---

[6] Stacy also argues that the ALJ failed to inquire as to whether or not the vocational expert's testimony conflicted with the Dictionary of Occupational Titles. (Plaintiff's Brief at 11-12.) Because I find that the vocational expert's testimony is irrelevant due to an incomplete hypothetical question posed by the ALJ, I need not address this argument.

DATED:    This 26th day of March, 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-27-